UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE KNIGHT,

    Plaintiff,

Case No. 1:10-cv-7

Hon. Robert J. Jonker

v.

ROBERT MULVANEY, *et al.*,

    Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1*et seq*. This matter is now before the court on a motion for summary judgment filed by defendants Robert Mulvaney and Mark Christiansen (docket no. 33).

    **I.**    **Background**

This action arose from incidents that occurred at the Carson City Correctional Facility (DRF) operated by the Michigan Department of Corrections (MDOC). Compl. at ¶ 3. Plaintiff has named three defendants in their individual and official capacities: Robert Mulvaney ("Central Office Security Threat Group Coordinator"); Mark Christiansen (Inspector at DRF); and "Unknown" McMillian (Assistant Inspector at DRF). *Id.* at ¶¶ 4-6. Plaintiff set forth the following allegations in support of his claim.

Plaintiff arrived at DRF on December 30, 2006. *Id.* at ¶ 6. On January 7, 2007, plaintiff was taken from his cell to the control room to speak to Captain Brandon regarding plaintiff's association with the Nation of Islam. *Id.* at ¶ 9. Some of the officers at the prison were

reportedly intimidated by plaintiff because he was holding religious discussions among prisoners in the television room and the yard. *Id.* After interviewing plaintiff Captain Brandon concluded that plaintiff was not a security threat and sent him back to his cell. *Id.* When plaintiff returned, he found several "religious documents" confiscated. *Id.* at ¶ 10. His possession of religious literature was later used to support plaintiff's designation as a member of a Security Threat Group (STG). *Id.*[1]

Later that day, plaintiff was taken back to the control center to meet with Assistant Inspector McMillian. *Id.* at ¶ 11. McMillian had spoken with Inspector Christiansen, who ordered that plaintiff be placed in segregation until he (Christiansen) "figured out" what to do with plaintiff. *Id.* McMillian referred to plaintiff's possession of Nation of Islam membership forms, stated that "[w]e're not gonna have you Muslims recruiting people" and sent plaintiff to segregation. *Id.* Plaintiff was held in detention and "deprived of all personal and religious property" from January 7th until his transfer to Marquette Branch Prison (MBP) on January 17th. *Id.* at ¶ 12.

On January 10th, while being held in segregation, plaintiff was questioned by an unidentified Lieutenant about his association with the Nation of Islam. *Id.* at ¶ 13. When plaintiff admitted that he was with the Nation of Islam, the lieutenant stated that Inspector Christiansen was going to place plaintiff on STG if he continued this association. *Id.* Plaintiff signed a renunciation form, prepared by Christiansen, to demonstrate that he was not an STG member. *Id.* On January 11th, defendant Mulvaney approved plaintiff for STG designation on Christiansen's recommendation as "Intolerant Subversive." *Id.* at ¶ 14. On February 2nd, plaintiff filed a

---

[1] An STG is defined as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as a discrete entity, poses a threat to staff or other prisoners or to the custody and security of the facility." MDOC Policy Directive 04.04.113 ¶ A. "Prisoners are prohibited from being members of an STG." *Id.* at ¶ I. A prisoner identified as an STG member can be designated as "STG I" or "STG II." *Id.* at ¶¶ J-Z.

complaint against Mulvaney on the ground that his STG designation and segregation at DRF was in retaliation for him practicing his religion. *Id.* at ¶ 16. Plaintiff filed other complaints and grievances on these issues.

Plaintiff alleged that as a member of the Nation of Islam, he "is required to disseminate Islamic theology, adhere to strict Islamic protocol, and disciplined rules of conduct." *Id.* at ¶ 28. Plaintiff further alleged that his constitutional rights were violated when he was designated as an STG leader and placed in segregation for practicing these tenets and possessing religious literature. *Id.* Plaintiff also asserts that the Nation of Islam is not an STG, but a religious organization authorized by MDOC Policy Directive 05.03.150. *Id.* at ¶ 29. The STG designation and segregation placement were adverse actions taken against plaintiff to deter him from engaging in protected conduct, i.e., "propagating Islamic theology, attending religious service, and possessing Islamic literature." *Id.* at ¶ 30. Plaintiff also asserts that his rights under the Equal Protection Clause has been violated because Christian and Jewish prisoners are not subject to STG designation and segregation for practicing their religious tenets. *Id.* at ¶ 34.

Plaintiff alleged that defendants violated his rights under the First Amendment (Free Exercise Clause and retaliation), Fourteenth Amendment (Due Process Clause and Equal Protection Clause), RLUIPA, and the Michigan Constitution. Defendant Mulvaney violated these rights "when he approved the Plaintiff's STG designation in retaliation for exercising Islamic tenets and for possessing religious literature." *Id.* at ¶ 36.[2] Defendant Christiansen violated these rights "when he retaliated against the Plaintiff for possessing Islamic literature and exercising tenets, by fabricating the STG Member Identification form to give the appearance that the Plaintiff's exercise

---

[2] The court notes that plaintiff failed to enumerate this paragraph in his complaint.

of Islamic tenets were gang related, and by placing the Plaintiff in segregation for 11 (eleven) days without a hearing or written notice of charge." *Id.* at ¶ 37. Defendant McMillian violated these rights "when he retaliated against the Plaintiff for possessing Islamic literature and exercising Islamic tenets by ordering officers to place the Plaintiff in segregation without a hearing or written notice of charge." *Id.* at ¶ 38. Plaintiff seeks injunctive relief in the form of an order directing defendant Mulvaney to expunge plaintiff's STG designation from his prison file, as well as compensatory and punitive damages against all defendants.

This matter is now before the court on a motion for summary judgment filed by defendants Mulvaney and Christiansen. Defendant McMillian has not yet been served in this matter.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is

4

not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Discussion

#### A. Timeliness of defendants' motion

Plaintiff contends that defendants' motion for summary judgment is untimely. According to plaintiff, defendants' motion was filed on May 18, 2010, one day after the court ordered due date of May 17, 2010. *See* Order (docket no. 19). Plaintiff's contention is without merit, because the court granted defendants a second extension allowing them to file their motion on June 16, 2010. *See* Order (docket no. 28).

#### B. First Amendment and RLUIPA claim

To the extent that plaintiff alleged a violation of the First and Fourteenth Amendments, he seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff's First Amendment claim alleged interference with the exercise of his religious beliefs (i.e., possessing Islamic literature and exercising the religion's tenets for the Nation

5

of Islam). "The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). This limitation of privileges arises "both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Evaluation of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination. *Id.* at 349. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.*

In a related claim, plaintiff alleged a violation of RLUIPA, a statute which prevents the government from placing a burden on prisoner's religious exercise. RLUIPA provides in pertinent part that:

> (a) No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

6

> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.

Section 3 of RLUIPA (42 U.S.C. § 2000cc-2) allows individuals to file actions under the statute as follows, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* at § 2000cc-2(a). For purposes of a claim brought under § 2000cc-2(a), the term "government" is defined as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law. . ." *Id.* at § 2000cc-5

RLUIPA does not define the operative term "substantial burden." The Sixth Circuit has looked to the Supreme Court's consideration of that term in the First Amendment context.

> In short, while the Supreme Court generally has found that a government's action constituted a substantial burden on an individual's free exercise of religion when that action forced an individual to choose between "following the precepts of her religion and forfeiting benefits" or when the action in question placed "substantial pressure on an adherent to modify his behavior and to violate his beliefs," [*Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981)], it has found no substantial burden when, although the action encumbered the practice of religion, it did not pressure the individual to violate his or her religious beliefs.

*Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir. 2007), citing also *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 449 (1988) and *Braunfield v. Brown*, 366 U.S. 599, 605-06 (1961). *See also, Barhite v. Caruso*, 377 Fed. Appx. 508, 511 (6th Cir. 2010) (quoting "substantial burden" standard as set forth in *Living Water Church of God*).

The court further observed that the statute requires courts "to walk a thin line" in resolving RLUIPA cases:

> On one hand, RLUIPA's definition of religious exercise covers most any activity that is tied to a religious group's mission, and "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to [an individual's] religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (inmate's RLUIPA action). On the other hand, and in tension with this broader definition of religious exercise, Congress has cautioned that we are to interpret "substantial burden" in line with the Supreme Court's "Free Exercise" jurisprudence, which suggests that a "substantial burden" is a difficult threshold to cross.

*Living Water Church of God*, 258 Fed. Appx. at 736. In this regard, the Supreme Court does not "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Thus, "an accommodation must be measured so that it does not override other significant interests." *Id.* "It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at fn. 13.

Here, plaintiff does not contest the validity any particular MDOC Policy Directive or regulation. Rather, he contends that defendants violated his rights by acting "maliciously, wantonly, and erroneously." Compl. at ¶¶ 36-38. Plaintiff's activities were observed by Resident Unit Manager (RUM) Robert Mote based on his monitoring of a Nation of Islam group service on January 5, 2007. Mote Aff. at ¶ 4 (docket no. 34-2). According to Mote, plaintiff was a Level V prisoner who transferred from Ionia Maximum Correctional Facility (ICF) to DRF on December 22, 2006. *Id.* at ¶ 6. Unlike previous group services conducted by prisoner Stephen McDowell, "where the atmosphere was relaxed and the service focused on self-help and guidance mixed with the Islam teachings," the January 5th meeting conducted by plaintiff was "much more animated" with a service structure that was "military in nature." *Id.* at ¶ 7. Unlike prior services, where the desks

8

were arranged in a circular configuration, plaintiff ordered that tables be placed in a row, all facing the front. *Id.* at ¶ 8. In addition, prisoners were "posted" at the front door and at the back of the room at the beginning and end of the service. *Id.* at ¶ 9. "Posting is the strategic placement of an individual to monitor surrounding activity." *Id.* at ¶ 14. This type of practice is prohibited by MDOC policy:

> When attending group religious services or activities, prisoners shall engage only in conduct appropriate to the practice of the religion. Prisoners shall not guard or control, or position themselves so as to appear to be guarding or controlling, the entrance to or exit from the religious service or activity. Militaristic type behavior (e.g., saluting each other; marching) shall not be permitted. Failure to comply with these requirements may result in the prisoner being required to leave the area or result in termination of the service or activity

MDOC Policy Directive 05.03.150 ¶ BB.

At the end of the service, prisoner McDowell approached RUM Mote and stated, "respectfully, we ask that there be no movement during the closing prayer." Mote Aff. at ¶ 10. Mote, who was the only staff member in the room, had never been "checked" on his movement during a prisoner religious service and based on his experience as a correctional officer, concluded that the statement "was clearly a contemptuous gesture by this prisoner toward authority." *Id.* at ¶¶ 11-12. Being the only staff member in the room, Mote did not address his concerns at that time, because he did not want to escalate the situation. *Id.* at ¶ 12. On the walk back to their cells after the service, plaintiff appeared to have ordered the prisoners to walk in a structured order, at one point motioning to one of the prisoner that he was out of order, with the prisoner responding by moving back into position. *Id.* at ¶ 13. After plaintiff's arrival at DRF, housing unit staff reported to Mote that Nation of Islam members were "posting" in the unit. *Id.* at ¶ 14. Mote also stated that several prisoners had approached him during this time frame advising that the Nation of Islam

9

members were holding meetings throughout the correctional facility in violation of MDOC policy. *Id.* at ¶ 15.[3]

RUM Mote advised Inspector Christiansen about the posting and meetings by Nation of Islam members. Christiansen Aff. at ¶¶ 17-18. As part of the investigation, a search of plaintiff's person and cell yielded certain literature, which was confiscated from plaintiff and included the following: a "Fruit of Islam" membership form; "member post orders;" a "weekly duty schedule, "a coded eight point agenda" and excerpts from a book entitled *Special Forces*, by Tom Clancy. *Id.* at ¶ 10 (docket no. 34-3); Sealed "Attachment 2" to Christiansen Aff. (docket no. 51). In opposing the STG designation, plaintiff executed an affidavit in which plaintiff: denied that he was involved in any fights, assaults or incidents of violence; stated that no member of staff or inmate was threatened or hurt; and stated that Christiansen and Mulvaney "simply did not like the thesis that I presented during the religious service which was exclusively instituted upon Nation of Islam theology, 'not' intolerant/subversive ideas." Knight Aff. at ¶ 11 (docket no. 66-1).

On January 10, 2007, Inspector Christiansen determined that plaintiff had affiliation as an "Intolerant Subversive" and was the leader of an STG. *See* STG Member Identification (docket no. 34-3 at pp. 20-21). Christiansen identified plaintiff for STG I designation due to self-admission, possession of documents and observed association with confirmed STG members. *Id.* Christiansen Aff. at 20. Christiansen also identified plaintiff for STG II designation due to his identification as a leader, enforcer, or recruiter in the STG. *See* STG Member Identification. Pursuant to MDOC Policy Directive 04.04.113(O), plaintiff was offered an opportunity to renounce

---

[3] MDOC Policy Directive 05.03.100 ¶ M provides that "[p]rison organizations shall be permitted to conduct meetings upon written request to the Warden or designee." The court notes that plaintiff alleged in his complaint that he held religious discussions among prisoners in the television room and the yard. Compl. at ¶ 9.

his association with the STG, but Inspector Christiansen rejected the renunciation. *See* Renunciation / Removal (docket no. 34-3 at p. 17).[4] Inspector Christiansen then recommended to the Central Officer STG Coordinator to designate plaintiff as an Intolerant Subversive Leader. Christiansen Aff. at 20. The final determination of a prisoner's STG designation is made by the Central Officer STG Coordinator. *Id.* at ¶ 21.

Plaintiff was placed in administrative segregation for seven business days. *Id.* at ¶ 23. Christiansen further stated that at no time did plaintiff inform him that plaintiff was denied any allowable property necessary to his religious beliefs. *Id.* at ¶ 24; *see* MDOC Policy Directive 04.05.120 ¶ U, item 26 ("a prisoner in any type of segregation shall be provided with or allowed to possess the following . . . 26. Personal property necessary to the practice of the prisoner's designated religion, as set forth in PD 05.03.150 'Religious Beliefs and Practices of Prisoners'").

Viewing the evidence in the light most favorable to plaintiff, the court concludes that the confiscated documents and plaintiff's actions presented a threat to DRF's need to maintain order and safety. The confiscated documents included a program of militaristic discipline with schedules, assignments, and codes, as well as the Tom Clancy *Special Forces* book (which bears the subtitle "A Guided Tour of U.S. Army Special Forces"). These documents do not appear to be religious in nature. To the extent that a religious organization uses these materials to recruit or maintain the discipline within that organization, such materials pose a serious threat to the operation of that organization within a correctional facility. In addition, plaintiff's militaristic behavior exhibited

---

[4] MDOC Policy Directive 04.04.113 ¶ O provides that the local STG Coordinator shall interview the prisoner, which shall include a review of the information contained on the STG Member Identification form. If the prisoner renounces membership in the STG and the local STG Coordinator finds the prisoner to be credible, the Coordinator shall have the prisoner sign the STG Renunciation/Removal form and STG Member Identification form shall not be processed. In all other cases, the local STG Coordinator shall forward the STG Member Identification form to the Central Office STG Coordinator for review.

during and after the January 5th service violated MDOC policy and challenged the authority of the correctional officer monitoring the service. Prisoners cannot subvert the operation of a correctional facility, whether under the guise of a sectarian organization or non-sectarian organization.

The confiscation of these documents was a reasonable exercise of authority by prison officials which did not violate plaintiff's rights under the First Amendment or place a substantial burden on his free exercise of religion under RLUIPA. In addition, plaintiff was designated as an STG II (leader) not for his religious beliefs, but for engaging in subversive behavior at the correctional facility. Accordingly, defendants' motion for summary judgment should be granted with respect to plaintiff's claims under First Amendment and RLUIPA.[5]

### C. Fourteenth Amendment Due process claim

Plaintiff's designation as a member of an STG, which could include administrative segregation, did not violate his Fourteenth Amendment rights. The Sixth Circuit has held that "[t]he MDOC's policy directive regarding the classification of inmates as STG members is rationally related to the legitimate state interest of maintaining order in the prison." *Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005). "[A]n increase in security classification, such as being classified as a[n] STG member, does not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life because a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification." *Id.* at 577 (internal quotation marks omitted). For this reason, a prisoner's designation as an STG member does not serve as the

---

[5] Having found that plaintiff has no RLUIPA claim, it is unnecessary to address defendants' contention that plaintiff's claim for monetary damages under RLUIPA is barred by the Eleventh Amendment. *See Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("We hold that, because RLUIPA's 'appropriate relief' language does not clearly and unequivocally indicate that the waiver [of sovereign immunity] extends to monetary damages, the Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA").

basis for claims under either the Equal Protection Clause or the Due Process Clause. *Id.* Accordingly, defendants' motion for summary judgment should be granted with respect to plaintiff's claim that his designation as a member of an STG and his administrative segregation violated the Fourteenth Amendment.

### D. Retaliation and other Equal Protection claims

Defendants have not briefed plaintiff's First Amendment retaliation claim (i.e., that defendants' identified him as an STG member in retaliation for his religious beliefs) or his other Equal Protection claim (i.e., that neither Jews nor Christians are considered STG's due to their religious beliefs). Accordingly, these claims remain pending before the court.

## IV. Recommendation

I respectfully recommend that defendants' motion for summary judgment (docket no. 33) be **GRANTED**. For the reasons stated in § III.D., *supra.*, plaintiff's retaliation claim and second Equal Protection claim remain pending in this action.

Dated: February 4, 2011 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).