UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE KNIGHT,

    Plaintiff,

Case No. 1:10-cv-7

Hon. Robert J. Jonker

v.

ROBERT MULVANEY, *et al.*,

    Defendants.
              /

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq*. This matter is now before the court on a motion for summary judgment filed by defendant James McMillian (docket no. 97). Defendant's motion for summary judgment is unopposed.[1]

  **I.**  **Background**

The court previously summarized plaintiff's claims as follows:

> This action arose from incidents that occurred at the Carson City Correctional Facility (DRF) operated by the Michigan Department of Corrections (MDOC). Compl. at ¶ 3. Plaintiff has named three defendants in their individual and official capacities: Robert Mulvaney ("Central Office Security Threat Group Coordinator"); Mark Christiansen (Inspector at DRF); and "Unknown" McMillian (Assistant Inspector at DRF). *Id.* at ¶¶ 4-6. Plaintiff set forth the following allegations in support of his claim.
>
> Plaintiff arrived at DRF on December 30, 2006. *Id.* at ¶ 6. On January 7, 2007, plaintiff was taken from his cell to the control room to speak to Captain Brandon regarding plaintiff's association with the Nation of Islam. *Id.* at ¶ 9. Some

---

[1] Plaintiff was released from the Michigan Department of Corrections on or about February 15, 2011. *See* Notice of Address Change (docket no. 88). The court notes that plaintiff has not filed any papers in this court since April 6, 2011. *See* Signature Page (docket no. 93).

of the officers at the prison were reportedly intimidated by plaintiff because he was holding religious discussions among prisoners in the television room and the yard. *Id.* After interviewing plaintiff Captain Brandon concluded that plaintiff was not a security threat and sent him back to his cell. *Id.* When plaintiff returned, he found several "religious documents" confiscated. *Id.* at ¶ 10. His possession of religious literature was later used to support plaintiff's designation as a member of a Security Threat Group (STG). *Id.* [FN 1]

Later that day, plaintiff was taken back to the control center to meet with Assistant Inspector McMillian. *Id.* at ¶ 11. McMillian had spoken with Inspector Christiansen, who ordered that plaintiff be placed in segregation until he (Christiansen) "figured out" what to do with plaintiff. *Id.* McMillian referred to plaintiff's possession of Nation of Islam membership forms, stated that "[w]e're not gonna have you Muslims recruiting people" and sent plaintiff to segregation. *Id.* Plaintiff was held in detention and "deprived of all personal and religious property" from January 7th until his transfer to Marquette Branch Prison (MBP) on January 17th. *Id.* at ¶ 12.

On January 10th, while being held in segregation, plaintiff was questioned by an unidentified Lieutenant about his association with the Nation of Islam. *Id.* at ¶ 13. When plaintiff admitted that he was with the Nation of Islam, the lieutenant stated that Inspector Christiansen was going to place plaintiff on STG if he continued this association. *Id.* Plaintiff signed a renunciation form, prepared by Christiansen, to demonstrate that he was not an STG member. *Id.* On January 11th, defendant Mulvaney approved plaintiff for STG designation on Christiansen's recommendation as "Intolerant Subversive." *Id.* at ¶ 14. On February 2nd, plaintiff filed a complaint against Mulvaney on the ground that his STG designation and segregation at DRF was in retaliation for him practicing his religion. *Id.* at ¶ 16. Plaintiff filed other complaints and grievances on these issues.

Plaintiff alleged that as a member of the Nation of Islam, he "is required to disseminate Islamic theology, adhere to strict Islamic protocol, and disciplined rules of conduct." *Id.* at ¶ 28. Plaintiff further alleged that his constitutional rights were violated when he was designated as an STG leader and placed in segregation for practicing these tenets and possessing religious literature. *Id.* Plaintiff also asserts that the Nation of Islam is not an STG, but a religious organization authorized by MDOC Policy Directive 05.03.150. *Id.* at ¶ 29. The STG designation and segregation placement were adverse actions taken against plaintiff to deter him from engaging in protected conduct, i.e., "propagating Islamic theology, attending religious service, and possessing Islamic literature." *Id.* at ¶ 30. Plaintiff also asserts that his rights under the Equal Protection Clause has been violated because Christian and Jewish prisoners are not subject to STG designation and segregation for practicing their religious tenets. *Id.* at ¶ 34.

2

Plaintiff alleged that defendants violated his rights under the First Amendment (Free Exercise Clause and retaliation), Fourteenth Amendment (Due Process Clause and Equal Protection Clause), RLUIPA, and the Michigan Constitution. Defendant Mulvaney violated these rights "when he approved the Plaintiff's STG designation in retaliation for exercising Islamic tenets and for possessing religious literature." *Id.* at ¶ 36. [FN 2] Defendant Christiansen violated these rights "when he retaliated against the Plaintiff for possessing Islamic literature and exercising tenets, by fabricating the STG Member Identification form to give the appearance that the Plaintiff's exercise of Islamic tenets were gang related, and by placing the Plaintiff in segregation for 11 (eleven) days without a hearing or written notice of charge." *Id.* at ¶ 37. Defendant McMillian violated these rights "when he retaliated against the Plaintiff for possessing Islamic literature and exercising Islamic tenets by ordering officers to place the Plaintiff in segregation without a hearing or written notice of charge." *Id.* at ¶ 38. Plaintiff seeks injunctive relief in the form of an order directing defendant Mulvaney to expunge plaintiff's STG designation from his prison file, as well as compensatory and punitive damages against all defendants.

> [FN 1] An STG is defined as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as a discrete entity, poses a threat to staff or other prisoners or to the custody and security of the facility." MDOC Policy Directive 04.04.113 ¶ A. "Prisoners are prohibited from being members of an STG." *Id.* at ¶ I. A prisoner identified as an STG member can be designated as "STG I" or "STG II." *Id.* at ¶¶ J-Z.
>
> [FN2] The court notes that plaintiff failed to enumerate this paragraph in his complaint.

Report and Recommendation at pp. 1-4 (docket no. 79).

The court previously granted summary judgment to defendants Mulvaney and Christiansen and dismissed them from this action. *See* Order and Judgment (March 15, 2011) (docket no. 87). This matter is now before the court on defendant McMillian's unopposed motion for summary judgment.

### II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, defendant's motion is unopposed. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

### III. Discussion

#### A. The alleged violations

To the extent that plaintiff alleged a violation of the First and Fourteenth Amendments, he seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff's First Amendment claim alleged interference with the exercise of his religious beliefs (i.e., possessing Islamic literature and exercising the religion's tenets for the Nation of Islam). "The First Amendment provides in pertinent part that "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). This limitation of privileges arises "both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Evaluation of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination. *Id.* at 349. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.*

In a related claim, plaintiff alleged a violation of RLUIPA, a statute which prevents the government from placing a burden on prisoner's religious exercise. RLUIPA provides in pertinent part that:

> (a) No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and

>   (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.

Section 3 of RLUIPA (42 U.S.C. § 2000cc-2) allows individuals to file actions under the statute as follows, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* at § 2000cc-2(a). For purposes of a claim brought under § 2000cc-2(a), the term "government" is defined as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law. . ." *Id.* at § 2000cc-5

RLUIPA does not define the operative term "substantial burden." The Sixth Circuit has looked to the Supreme Court's consideration of that term in the First Amendment context.

>   In short, while the Supreme Court generally has found that a government's action constituted a substantial burden on an individual's free exercise of religion when that action forced an individual to choose between "following the precepts of her religion and forfeiting benefits" or when the action in question placed "substantial pressure on an adherent to modify his behavior and to violate his beliefs," [*Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981)], it has found no substantial burden when, although the action encumbered the practice of religion, it did not pressure the individual to violate his or her religious beliefs.

*Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir. 2007), citing also *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 449 (1988) and *Braunfield v. Brown*, 366 U.S. 599, 605-06 (1961). *See also, Barhite v. Caruso*, 377 Fed. Appx. 508, 511 (6th Cir. 2010) (quoting "substantial burden" standard as set forth in *Living Water Church of God*).

The court further observed that the statute requires courts "to walk a thin line" in resolving RLUIPA cases:

> On one hand, RLUIPA's definition of religious exercise covers most any activity that is tied to a religious group's mission, and "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to [an individual's] religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (inmate's RLUIPA action). On the other hand, and in tension with this broader definition of religious exercise, Congress has cautioned that we are to interpret "substantial burden" in line with the Supreme Court's "Free Exercise" jurisprudence, which suggests that a "substantial burden" is a difficult threshold to cross.

*Living Water Church of God*, 258 Fed. Appx. at 736. In this regard, the Supreme Court does not "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Thus, "an accommodation must be measured so that it does not override other significant interests." *Id.* "It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at fn. 13.

### B. Plaintiff's claims against defendant McMillian

Plaintiff's interaction with defendant McMillian allegedly occurred on January 7, 2007, when he was escorted to the control center at DRF. Compl. at ¶ 11. At that time, McMillian inquired as to whether plaintiff was circulating membership forms to recruit prisoners for the Nation of Islam. *Id.* Plaintiff claims that after the meeting, McMillian ordered officers to place plaintiff in segregation, without a hearing or written notice of charge, "for possessing Islamic literature and exercising Islamic tenets." *Id.* at ¶ 38. Plaintiff does not contest the validity any particular MDOC Policy Directive or regulation. Rather, he contends that defendant McMillian violated his rights by acting "maliciously, wantonly, and erroneously." *Id.*

#### 1. Defendant McMillian did not place plaintiff in segregation

8

Defendant McMillian's duties as an inspector at DRF included interviewing prisoners who circulated membership forms to determine whether any gang or STG related activities were being conducted. James McMillian Affidavit at ¶ 5 (docket no. 98-1). Defendant McMillian had no recollection of interviewing plaintiff on January 7, 2007. *Id.* Although McMillian could not recall the nature of this particular interview, McMillian could not have instructed officers to place plaintiff in temporary segregation after the interview, because plaintiff was already in temporary segregation, having been placed there on the previous day (January 6, 2007). *Id.* at ¶¶ 6-7; Christiansen Affidavit at ¶ 22. Viewing the facts in the light most favorable to plaintiff, there is no evidence that McMillian retaliated against plaintiff by ordering officers to place plaintiff in temporary segregation based upon the religious matters discussed on January 7, 2007.

### 2.  **Plaintiff was properly placed in temporary segregation**

Similarly, there is no factual basis for plaintiff's claim that he was held in "detention" without receiving a misconduct violation and that he was deprived of all religious and personal property from January 7 through January 17, 2007. Compl. at ¶ 12. As an initial matter, defendant McMillian stated in his affidavit that plaintiff was not placed in "detention," but housed in "temporary segregation" from January 6 through January 16, 2007. McMillian Aff. at ¶ 8; History of Cell Usage (docket no. 98-1 at p. 5). "Temporary Segregation" is used to remove a prisoner from the general population for no longer that seven business days, pending a hearing for a major misconduct violation, classification to administrative or protective segregation, or transfer. *See* MDOC Policy Directive 04.05.120 at ¶¶ F and G. "Detention" (or "Punitive Segregation") refers to the detention sanction for a major misconduct violation as ordered by a hearing officer which

"shall be served in a cell designated for punitive segregation rather than in a designated administrative segregation cell." *Id.* at ¶ T.

Contrary to plaintiff's allegations, there is no evidence that he was placed in detention (punitive segregation). Rather, plaintiff was placed in temporary segregation. McMillian Aff. at ¶¶ 7-9. While plaintiff claims that he was detained without a hearing or written notice of charge, he was not entitled to a hearing or written notice prior to placement in temporary segregation. *See* Policy Directive 04.05.120 ¶ F (providing that a prisoner is not required to be given written notice of temporary segregation). Temporary segregation is for a limited time period, limited to seven business days. *See* Policy Directive 04.05.120 at ¶ G. In determining the length of temporary segregation, the day on which the prisoner is placed in temporary segregation is not counted, but the day on which the prisoner is released is counted. *Id.* Here, the record reflects that plaintiff was placed in temporary segregation for seven business days as allowed under the policy directive (i.e., from Saturday, January 6, 2007 through Tuesday, January 16, 2007). *See* McMillian Aff. at ¶ 9.

Finally, there is no evidence that plaintiff was deprived of any religious property while in temporary segregation. The Policy Directives provide that, while in "any type of segregation," a prisoner shall be provided with or allowed to possess personal property necessary to the practice of the prisoner's designated religion. Policy Directive 04.05.120 at ¶ U, Item 26; McMillian Aff. at ¶ 10. In his uncontested affidavit, McMillian stated that "[a]t no time did [plaintiff] inform me that he was denied any allowable property necessary to his religious beliefs." McMillian Aff. at ¶ 10. Viewing the facts in the light most favorable to the non-movant, the court concludes that defendant McMillian is entitled to summary judgment.

    **IV.**    **Recommendation**

For the reasons set forth above, I respectfully recommend that defendant McMillian's motion for summary judgment (docket no. 97) be **GRANTED** and that this case be dismissed.

Dated: July 30, 2012 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).